# 2006 DTA 106

**TRIBUNAL DE APELACIONES
REGIÓN JUDICIAL DE SAN JUAN
PANEL III**

DEPARTAMENTO DE LA FAMILIA
Demandante-Recurrido

v.

ROSAURA GOTAY GOTAY, ROBERTO COLÓN GARCÍA
Demandados-Peticionarios

Núm. KLCE-2006-00373

San Juan, Puerto Rico, a 14 de agosto de 2006

Panel integrado por su Presidenta, la Juez Bajandas Vélez,
el Juez Vivoni del Valle y la Juez Fraticelli Torres

Fraticelli Torres, Jueza Ponente

**TEXTO COMPLETO DE LA SENTENCIA**

En el recurso de autos debemos resolver si al amparo de la Ley para el Bienestar y la Protección Integral de la Niñez, Ley 177 de 1 de agosto de 2003, 8 L.P.R.A. sec. 444, *et seq.*, el Tribunal de Primera Instancia abusó

de su discreción: (1) al cualificar y aceptar como perito a la trabajadora social independiente que realizó las entrevistas y evaluaciones para validar el alegado abuso sexual cometido por la peticionaria Rosaura Gotay Gotay y el señor Roberto Colón García en las personas de sus hijas menores de edad; (2) al aceptar el testimonio y el informe sometido por la trabajadora social designada con ese propósito; (3) al no autorizar la realización de la evaluación sicológica solicitada por una perito seleccionada por la parte peticionaria; y (4) al eximir al Departamento de la Familia de realizar esfuerzos razonables para reunificar a las menores con sus progenitores y descartarlos a ambos como recurso para la tenencia física de sus hijos.

Dadas las circunstancias específicas del caso, la accidentada cronología administrativa y procesal que precede el recurso de autos y la repetida intervención con los peticionarios por alegados hechos análogos en el pasado, confirmamos la resolución recurrida. El bienestar de los menores aludidos es peso suficiente para inclinar la balanza a favor de la discreción ejercida por el foro recurrido en un caso en el que, al filo de casi 6 años de procesos administrativos y judiciales y más de 20 vistas de seguimiento y evidenciarias, finalmente aquilató y adjudicó los derechos de las partes, sobre todo, de las más vulnerables: los hijos e hijas de la peticionaria.

## I

Los procesos de privación de custodia incoados a tenor de la Ley para el Bienestar y la Protección Integral de la Niñez, ya citada, procuran garantizar el bienestar de los menores de edad que no reciben atención ni protección debida de sus progenitores. El caso de autos responde, pues, al interés del Estado de dar a esos niños y niñas un hogar alterno en el que puedan desarrollarse de manera integral.

Sin embargo, el ejercicio de la custodia sobre la prole, como atributo inherente de la patria potestad, es un derecho de estirpe constitucional y ha sido enmarcado dentro del concepto *"libertad"* de la Decimocuarta Enmienda de la Constitución de los Estados Unidos, en el que están incluidos, entre otros, el derecho a casarse, a establecer un hogar, a procrear y a criar a los hijos e hijas. *Meyer v. Nebraska*, 262 U.S. 390, 399-400 (1923); *Skinner v. Oklahoma,* 316 U.S. 535, 536 (1942). Es decir, la relación entre las madres, los padres y sus hijos e hijas está protegida constitucionalmente y se ha establecido que los progenitores tienen la facultad y el derecho a decidir sobre el cuido, la custodia y el control de sus hijos. *Pierce v. Society of Sisters,* 268 U.S. 510, 535 (1925); *Wisconsin v. Yoder,* 406 U.S. 205, 232 (1972); *Stanley v. Illinois,* 405 U.S. 645, 651 (1972); *Quilloin v. Walcott,* 434 U.S. 246, 255 (1978); *Washington v. Glucksberg,* 521 U.S. 702, 720 (1997).

Por tener protección constitucional, el Estado tiene que cumplir con los requisitos de la cláusula constitucional del debido proceso para poner fin a la relación entre los progenitores y sus hijos e hijas: *"...not disputed that state intervention to terminate the relationship between [a parent] and [the] child must be accomplished by procedures meeting the requisites of the Due Process Clause". Santosky v. Kramer* 455 U.S. 745, 753 (1982).

La protección que provee el debido proceso de ley a las relaciones paterno y materno-filiales procura evitar que el Estado abuse de sus poderes y que los utilice como instrumento de opresión o de forma arbitraria, particularmente contra los menos aventajados social, cultural y económicamente. Los menores de edad no son criaturas del Estado, sujetos al juicio subjetivo y discrecional de sus funcionarios sobre lo que es mejor o más conveniente para ellos. *Davidson v. Cannon,* 474 U.S. 344, 348 (1986); *Daniels v. Williams,* 474 U.S. 327, 331 (1986).

El Tribunal Supremo federal ha expresado que el interés fundamental de los padres y las madres no se esfuma automáticamente porque éstos no hayan sido buenos proveedores o los mejores modelos de conducta para sus hijos e hijas. Independientemente de ello, se requiere un proceso justo para romper las relaciones paterno y materno-filiales, sobre todo, si se persigue interrumpir definitivamente la relación familiar. En cuanto a esta privación, el foro federal declaró: *"When the State initiates a parental rights termination proceeding, it*

*seeks not merely to infringe that fundamental liberty interest, but to end it. [...] If the State prevails, it will have worked a unique kind of deprivation [...] A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one."* Lassiter v. Dpt. of Social Service, 452 U. S. 18, 27 (1981). También añadió:

*"The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures."*

(Énfasis nuestro.) *Santosky v. Kramer*, 455 U.S. 745, 753 (1982).

En Puerto Rico, los tribunales tenemos que evaluar la protección de las relaciones familiares bajo el crisol del derecho a la intimidad. Este derecho y el de protección a la dignidad del ser humano tienen un origen constitucional explícito en nuestra jurisdicción: *"Toda persona tiene derecho a la protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar"*. Const. E.L.A. Art. II, Sec. 8. Esas garantías fundamentales no necesitan de legislación habilitadora que les insufle vida, ya que operan por su propia fuerza o *ex proprio vigore*. *Figueroa Ferrer v. E.L.A.*, 107 D.P.R. 250, 259, 275 (1978); *Arroyo v. Rattan Specialties, Inc.*, 117 D.P.R. 35, 64 (1986). Véase, además, R. Serrano Geyls, *Derecho de Familia de Puerto Rico*, San Juan, Facultad de Derecho Universidad Interamericana, 2002, Volumen II, págs. 1098-1099.

A base de las normas reseñadas, es forzoso concluir que la madre o el padre a quien se pretenda privar de la custodia de sus hijos tiene derecho a comparecer a una vista y presentar prueba para impedir la privación; así como a confrontar la prueba que pueda tener el Estado en cuanto a su incapacidad para ejercerla.

Este foro apelativo no puede subestimar los intereses privados y estaduales en juego, pero, en aras de proteger el alegado bienestar inmediato que rodea a los dos menores, cuyo bienestar puede afectarse por la acción de autos, no podemos tampoco comprometer los postulados básicos y esenciales que sostienen nuestra vida de pueblo ni la integridad de nuestras instituciones democráticas. La toga nos impone la obligación de analizar los intereses en conflicto, aplicar las normas jurídicas que gobiernan la controversia y resolver según nos dicta nuestra conciencia.

Ante el reclamo de la peticionaria *y las circunstancias particulares del caso de autos*, lo que debemos analizar es si la prueba ofrecida y admitida por el tribunal recurrido es suficiente para validar el abuso sexual imputado a los dos progenitores y para ratificar la privación de la custodia de la peticionaria y la remoción definitiva de sus hijos del hogar materno, a tenor de la Ley para el Bienestar y la Protección Integral de la Niñez, Ley 177, ya citada.

Luego de examinar la resolución fundamentada que nos presentó el juez que atendió la vista, según le intimamos el 21 de marzo de 2006, a tenor de la Regla 83.1 del Reglamento del Tribunal de Apelaciones, **2004 J.T.S. 112**, resolvemos que el tribunal *a quo* no abusó de su discreción al denegar la petición de la madre peticionaria de someter a sus hijos a nuevas evaluaciones sicológicas por una perito de su selección y al basar su determinación en el informe pericial en controversia.

## II

El 11 de diciembre de 1999, el Departamento de la Familia recibió una querella a través de la línea del Programa de Emergencias Sociales, en la que se alegaba negligencia por parte de la Sra. Rosaura Gotay Gotay y

el señor Roberto Colón García hacia sus cinco hijos menores: A.C.G., F.C.G., B.C.G., R.C.G. y C.M.C.G., de 8, 7, 6, 5 y 3 años de edad, respectivamente. Posteriormente, el Departamento recibió dos referidos adicionales en los que pudo constatar que existía maltrato físico de estos padres hacia sus hijos, pero la agencia atendió la situación mediante orientación a los progenitores sin separar a los menores del hogar paterno. (Alegato del DF, pág. 2.)

El 17 de julio de 2002 el Programa de Emergencias Sociales del Departamento de la Familia, a tenor de las facultades que le concedía la Ley 342 de 16 de diciembre de 1999, 8 L.P.R.A. secs. 441 *et seq.*, solicitó la custodia legal provisional de todos los hijos de Gotay Gotay y Colón García, por causa de las manifestaciones hechas por los propios niños de que eran víctimas del maltrato físico de parte de sus padres. *Íd.*

Luego de la remoción, la niña R.C.G. manifestó a la madre de crianza del hogar donde fue ubicada y a su maestra de kindergarden que había sido molestada sexualmente por su padre. La menor de cinco años les expresó *"que se encerraba en el cuarto con su padre y que éste le ordenaba que le mamara el pipi, que papá tiene el pipi grande y que tiene mucho pelo ahí"*.

Asimismo, el menor F.C.G. mostró conducta sexualizada en el hogar de crianza donde fue ubicado, ya que *"besaba en la boca a otros niños, quería entrar al cuarto de las niñas y besarlas en la boca, se acercaba por detrás de los niños y comenzaba a hacerles movimientos y le gustaba decirle fresquerías y palabras obscenas a los otros menores"*. Cabe señalar que este niño estaba ubicado en un hogar distinto al de su hermana. *Íd.*

Coinciden las dos partes ante nos que en la vista de ratificación celebrada el 31 de octubre de 2002, los padres promovidos estipularon que la remoción de los menores por parte del Departamento se hizo conforme a Derecho. El Departamento elaboró, entonces, un Plan de Servicios a los progenitores para lograr el retorno de los niños al núcleo familiar y el tribunal estableció un plan de seguimiento que comprendía evaluaciones sicológicas y siquiátricas a los padres, Talleres de Escuela de Padres, sesiones con Alcohólicos Anónimos y seguimiento de las necesidades particulares que presentaba cada uno de los niños, —entre éstas, quemaduras, impétigo y déficit de atención—, y evaluaciones a los menores sobre posible abuso sexual por parte de los progenitores. Tanto los progenitores como todos los hermanos fueron referidos a la Clínica de la Universidad Carlos Albizu para las evaluaciones de rigor que permitieran validar o descartar la existencia del abuso sexual, particularmente de la menor R.C.G.

El 26 de octubre de 2004, el Tribunal de Primera Instancia celebró una vista de seguimiento. El Departamento de la Familia le informó al tribunal *a quo* que aún estaba pendiente la validación del alegado abuso sexual de R.C.G. Señaló que la Universidad Carlos Albizu cerró el caso debido a que el trabajador social de la agencia no llevó a los menores a las citas programadas. ■ Por razones que no surgen del expediente, y en contra de las recomendaciones del Departamento, el Tribunal de Primera Instancia devolvió la custodia legal de los menores a sus padres, con un seguimiento administrativo durante el período de los seis meses siguientes, y decretó el cierre y archivo del caso KMM-2002-152. En la resolución manifestó, sin embargo, *"su preocupación, puesto que no hubo el seguimiento requerido en el presente caso por parte del Departamento de la Familia"*. (Apéndice del recurso, pág. 2.)

El 24 de febrero de 2005, la Sra. Minerva Montalvo, trabajadora social escolar de la Escuela José M. Solí, llamó al Departamento de la Familia para informar que la menor R.C.G. le había hecho ciertas manifestaciones que indicaban que ésta había sido víctima de abuso sexual por parte de su padre. La menor R.C.G. le manifestó de manera espontánea que su padre le introducía el pene por el ano, le tocaba la vulva y que estaba enamorado de ella. La Sra. Montalvo asumió inmediatamente la custodia protectora de las menores R.C.G. y C.M.C.G y acudió al Cuartel de la Policía de Cupey, junto a la Sra. Brunilda Rivera, supervisora de la Administración de Familias y Niños, para que entrevistaran a las niñas. El Departamento de la Familia asignó a la Sra. Ana M. Quiñónez, trabajadora social de la agencia, para que realizara la investigación. (Alegato del DF, Anejo 1.)

Según el informe de la investigación que siguió al incidente, suscrito por ambas funcionarias de la agencia, la Sra. Quiñónez y la Sra. Rivera, las dos niñas fueron entrevistadas individualmente y por separado. R.C.G. expresó: *"Papi me da besos en la boca, me hace fresquerías, me toca la vulva y me mete el deo por el culo"*. Se le preguntó a la menor cuándo ocurrían los hechos y la menor contestó que cuando llegaba de la escuela en las tardes y cuando su mamá estaba en el cocina. La trabajadora social le preguntó a la menor si ella se lo había dicho a su mamá y la niña contestó en la afirmativa. Indicó: *"Mami me pega con la correa y me dice [que] lo que ocurre en la casa no se puede decir en la escuela; Mami me arrodilla con las manos hacia arriba"*. (Alegato del DF, Anejo 1.)

La Sra. Quinones también entrevistó a la niña C.M.C.G. y ésta expresó que sus hermanos se bañaban con su papá y sus hermanas con su mamá. La trabajadora social auscultó con la menor si había tenido *"acercamiento sexual"* y *"la menor no emitió comentario alguno al respecto"*. *Íd.*

Según el aludido informe, la peticionaria, como madre de las menores, se personó al cuartel y la trabajadora social la entrevistó. La Sra. Gotay manifestó que todo lo que había expresado la menor R.C.G. era mentira; intentó reprender a la menor y *"le recriminó que todo era mentira"*. *Íd.*

Ante estos hechos, el Departamento de la Familia solicitó inmediatamente, en la Sala de Investigaciones del Tribunal de Primera Instancia, la custodia provisional de las niñas R.C.G. y C.M.C.G. Ésta le fue otorgada Departamento de la Familia, al amparo de la Ley para el Bienestar y la Protección Integral de la Niñez, Ley. 177, ya citada. El Departamento de la Familia removió a las menores de su hogar el 24 de febrero de 2005 y las ubicó en hogares certificados por esa dependencia. Los hijos varones permanecieron en el hogar paterno. *Íd.*

En la vista de ratificación de custodia celebrada el 15 de marzo de 2005, el Tribunal de Primera Instancia convirtió esa vista en una de seguimiento del caso anterior (KMM-2002-152), basándose en que se trataba de las mismas partes y en que el incidente procesal se daba dentro del período de seguimiento administrativo ordenado previamente, cuando devolvió la custodia de las menores a los peticionarios. Por tal razón, ordenó el archivo del caso nuevo (KMM-2005-0030) y reabrió el caso previo iniciado en 2002. (Apéndice del recurso, pág. 3.)

El Tribunal de Primera Instancia ordenó al Departamento de la Familia auscultar si debía cambiarse el Plan de Permanencia; determinar si descartaba a los padres como recursos o si serán considerados como tal; y evaluar a la menor R.C.G. por un sexólogo, por el alegado abuso sexual. Refirió el caso al Centro Biosicosocial de la Dra. Brenda Mirabal, para que las dos menores R.C.G. y C.M.C.G. fueran evaluadas física y emocionalmente y se rindiera un informe al Tribunal. (Apéndice del recurso, pág. 3.)

En la vista de seguimiento realizada el 14 de abril de 2005, el Tribunal de Primera Instancia ordenó que se le diera seguimiento a la validación de abuso sexual que realizaría la Clínica de la Universidad Carlos Albizu y que todos los menores fueran evaluados tanto física como emocionalmente, incluidos los varones que aún permanecían en compañía de los peticionarios. También reiteró la orden dada al Departamento de la Familia para que determinara si descartaba a los padres como recurso y si el Plan de Servicios continuaba siendo el retorno al hogar. Ordenó a los padres a comparecer con representación legal a la siguiente vista. (Apéndice del recurso, pág. 4.)

El Departamento de la Familia presentó una *"Solicitud Urgente de Remedio"* el 4 de agosto de 2005, mediante la cual le informó al foro de primera instancia que las menores estaban siendo evaluadas en la Clínica Carlos Albizu, pero que esa institución no podía evaluar a los menores varones, debido a su política de no entrevistar a menores que estuviesen residiendo en el hogar y manteniendo contacto directo con el que ellos identificaban como agresor, para evitar que la evaluación se contaminara. Ante este hecho, el Departamento solicitó al tribunal que ordenara la remoción de los cuatro varones del hogar. (Apéndice del recurso, págs. 6-7.)

El foro a *quo* acogió la solicitud y dictó una orden a esos efectos en la misma fecha. (Apéndice del recurso, pág. 8.)

El 11 de agosto de 2005, el Tribunal de Primera Instancia celebró otra vista de seguimiento. **En esta ocasión, el Departamento de la Familia sometió el Informe Pericial de Alegaciones de Abuso Sexual, suscrito por la Sra. María D. Ortiz Díaz, trabajadora social de la Universidad Carlos Albizu, en el cual se validaba el abuso sexual por parte de ambos padres hacia las menores R.C.G. y C.M.C.G.** El tribunal recurrido aceptó el informe de validación "*con el entendido de que es una Trabajadora Social quien lo realiza*".

El foro de primera instancia también ordenó la evaluación por posible abuso sexual de los menores varones; designó —con la anuencia de las partes—, a la Dra. Brenda Mirabal como perito del tribunal; ordenó la evaluación sicológica de todos los menores; y ordenó la citación y notificación como perito de la Dra. Mirabal para el siguiente señalamiento. (Apéndice del recurso, pág. 9.)

**El Departamento de la Familia solicitó oportunamente la reconsideración de esa orden.** Le solicitó al Tribunal de Primera Instancia que antes de que ese foro descartara el informe sometido por la trabajadora social Ortiz Díaz y ordenara que los menores fueran sometidos nuevamente a una segunda evaluación en la que serían revictimizados, se citara a la trabajadora social para que ésta fuera contrainterrogada y cualificada como perito, conforme a la Regla 53 de Evidencia, 32 L.P.R.A. Ap. IV, R. 53. (Apéndice del recurso, págs. 10-11.) El Tribunal de Primera Instancia acogió la moción de reconsideración y ordenó la citación de la Sra. Ortiz Díaz para que ésta fuese contrainterrogada por todas las partes y cualificada como perito en el área de abuso sexual. (Apéndice del recurso, pág. 12.) Tal determinación dejó sin efecto la designación de la Dra. Mirabal como perito para hacer las pruebas sicológicas a todos los niños.

En la vista de seguimiento del 15 de noviembre de 2005, el Tribunal de Primera Instancia le concedió tiempo al abogado del peticionario Colón Gotay para que se preparara para impugnar el testimonio de la trabajadora social como perito. Además, entregó a ambos peticionarios copia de las cualificaciones de la trabajadora social. Éstos ya habían tenido acceso al informe rendido por ella. El tribunal *a quo* señaló la siguiente vista de cualificación para el 19 de enero de 2006. (Apéndice del recurso, pág. 13.) Aparentemente esa vista fue pospuesta para el 16 de febrero de 2006.

Así las cosas, el 23 de enero de 2006, la abogada de la peticionaria Gotay Gotay presentó una Moción Informativa y Solicitud de Autorización para que la Dra. Amarilys Muñoz Colón fuera su perito y se le permitiera evaluar a todos los menores. Adujo que, al acceder a la solicitud del Departamento de la Familia para que se citara a la trabajadora social para cualificarla como perito en el área de abuso sexual, el foro de primera instancia implícitamente descartó a la Dra. Brenda Mirabal como perito del tribunal. Por tal razón, esa parte interesaba contratar como perito a la Dra. Amarilys Muñoz Colón, doctora en sicología clínica con vasta experiencia en el área de abuso sexual. (Apéndice del recurso, págs. 15-16.) El tribunal *a quo* denegó esta solicitud sin exponer las razones en que basaba su decisión. (Apéndice del recurso, pág. 17.)

La madre de los menores solicitó reconsideración de esa determinación en la que señaló que tenía derecho a presentar evidencia pericial adicional al perito que presentara el Estado, conforme a la Regla 59(D) de Evidencia, 32 L.P.R.A. Ap. IV, R. 59(D), y al debido procedimiento de ley. ■ Esa parte fundamentó la necesidad de contar con su propio peritaje: (1) en la denegatoria por parte del tribunal a que se nombrara un perito del tribunal que contase con la confianza de todas las partes; (2) en que la única evaluadora de los menores en el caso era una trabajadora social con limitada experiencia en el campo de abuso sexual; (3) en que los menores no habían sido evaluados sicológicamente por un profesional de la conducta humana con adiestramiento en el área de abuso sexual; (4) en que los menores objeto de abuso sexual habían estado bajo la custodia del Departamento de la Familia durante varios años en un sinnúmero de hogares de crianza, con excepción de un breve período que le fueron devueltos a sus padres; (5) en que los padres no habían sido

evaluados o entrevistados por el perito del Estado; (6) en que los menores no habían estado expuestos a extensas evaluaciones, debido a que del informe de la trabajadora social se desprendía que las menores habían sido entrevistadas brevemente en tres ocasiones únicamente; (7) en la naturaleza y gravedad de las imputaciones; y (8) en que no permitir a esa parte contar con su perito le impediría defenderse y la mantendría en un estado de indefensión. (Apéndice del recurso, págs. 18-19.)

El Tribunal de Primera Instancia denegó la moción de reconsideración por el fundamento de que ya había aceptado el informe pericial sobre las alegaciones de abuso sexual de las menores "*con el entendido de que es una Trabajadora Social quien lo realiza*" y en que ya había citado la vista para cualificar como perito a la trabajadora social Ortiz Díaz. (Apéndice del recurso, pág. 20.)

La vista evidenciaria para validar o descartar el alegado abuso sexual se llevó a cabo el 16 de febrero de 2006. Luego del interrogatorio de las partes a la Sra. Ortiz Díaz, el Tribunal de Primera Instancia determinó que ésta cumplía con los requisitos de las Reglas 52 y 53 de Evidencia, 32 L.P.R.A. Ap. IV, Rs. 52 y 53, por lo que permitiría su testimonio como perito, basado en el informe pericial preparado por ella. [3] **Asimismo, luego de evaluar el testimonio de la trabajadora social, así como el informe pericial y la totalidad del expediente presentado, el tribunal *a quo* emitió una resolución en la que validó el abuso sexual, eximió al Departamento de la Familia de realizar esfuerzos razonables para preservar la unidad familiar y descartó a los padres como recursos de los menores.**

Inconforme con esa determinación, la madre de los menores presentó ante nos este recurso de *certiorari*. La peticionaria también presentó junto a su recurso una moción de auxilio de jurisdicción en la que solicitó la paralización del caso en el Tribunal de Primera Instancia. Acogimos esa solicitud y ordenamos la paralización de los procedimientos ante el tribunal *a quo*. Además, le ordenamos al foro de primera instancia que expusiera por escrito los fundamentos en que basó su resolución de 16 de febrero de 2006.

El Tribunal de Primera Instancia contestó nuestro requerimiento y nos sometió los fundamentos de su determinación. Señaló que basó su decisión en que la solicitud de la madre de los menores para que se nombrara un perito de esa parte fue presentada tardíamente, fuera de término y sin justificación alguna. Según el tribunal *a quo*, **transcurrieron cuatro meses desde que ese foro emitió la resolución en la que declaró con lugar la moción de reconsideración del Departamento de la Familia, y autorizó que se cualificara como perito a la trabajadora social, en lugar de nombrar un perito distinto para que evaluara nuevamente a los menores.** Debido a que los padres de los menores no recurrieron oportunamente de ese dictamen, el foro de primera instancia expresó que éstos se sometieron a su decisión por su inacción. En esa ocasión, ni en ocasión anterior, la peticionaria solicitó la evaluación de los menores con su propio perito.

El Tribunal de Primera Instancia también basó su decisión en la doctrina jurisprudencial que establece que una parte debe demostrar una "*clara necesidad*" para justificar la evaluación sicológica de los menores de edad. Según el tribunal *a quo*, esa clara necesidad no surgía de la solicitud presentada por la madre de los menores. El foro recurrido indicó, además, que tanto el juez como todas las partes examinaron ampliamente la calificación de la trabajadora social Ortiz Díaz como perito. Concluyó que la experiencia profesional y práctica en la materia de abuso sexual la cualificaban como perito al amparo de las Reglas 52 y 53 de Evidencia.

La resolución fundamentada del tribunal recurrido concluye:

En la valoración de estos hechos, el tribunal determinó *por lo preponderante de la evidencia, que se había constituido el abuso sexual y que en este caso procede la privación de la custodia legal*, por lo que eximió al Departamento de la Familia de hacer esfuerzos razonables con estos padres *por estar los mismos descartados como recurso (sic) de estos menores*.

Énfasis nuestro.

## III

En su recurso de *certiorari*, la peticionaria plantea que el Tribunal de Primera Instancia cometió dos errores, que se dividen en los siguientes asuntos: (1) al no nombrar un perito del tribunal; (2) al no permitir a la parte peticionaria contratar su propio perito y, de ese modo, salvaguardar el derecho de la peticionaria a un debido procedimiento de ley; (3) al validar el alegado abuso sexual de las menores; (4) al eximir al Departamento de la Familia de hacer esfuerzos razonables para reunificar a los menores con sus padres y al descartar a éstos como recurso.

## A

La Regla 53 de Evidencia, *supra*, dispone lo requerido para la cualificación de una persona como perito en un proceso judicial:

*"(A) Toda persona está cualificada para declarar como testigo pericial si posee especial conocimiento, destreza, experiencia, adiestramiento o instrucción suficientes para cualificarla como un experto o perito en el asunto sobre el cual habrá de prestar testimonio. Si hubiere objeción de parte, dicho especial conocimiento, destreza, adiestramiento o instrucción deberán ser probados antes de que el testigo pueda declarar como perito.*

*(B) El especial conocimiento, destreza, experiencia, adiestramiento o instrucción de un testigo pericial podrán ser probados por cualquier evidencia admisible, incluyendo su propio testimonio."*

La Regla 54 de Evidencia, 32 L.P.R.A. Ap. IV, R. 54, dispone lo referente al contrainterrogatorio de peritos:

*"(A) Sujeto a lo dispuesto en el inciso (B) de la Regla 53, todo testigo que declare en calidad de perito podrá ser contrainterrogado con igual amplitud y alcance que cualquier otro testigo y, además, podrá ser plenamente contrainterrogado sobre:*

*(1) sus cualificaciones como perito;*

*(2) el asunto objeto de su testimonio pericial; y*

*(3) los hechos, datos y circunstancias en que su testimonio se funda."*

En términos generales, el valor probatorio del testimonio pericial depende de varios factores, entre los que se destacan los siguientes: (1) las calificaciones del perito; (2) la solidez de las bases de su testimonio; (3) la confiabilidad de la ciencia o técnica subyacente; y (4) la parcialidad que demuestre al emitir su juicio. Ernesto L. Chiesa, *Tratado de Derecho Probatorio*, **Publicaciones J.T.S.**, Tomo I, 1998, pág. 593.

Como ocurre generalmente, los peritos de parte favorecen la posición de la parte, por lo que el perito nombrado por el tribunal, por su imparcialidad, se convierte en un valioso recurso para informar con objetividad sobre los factores sicológicos, emocionales o sociales que inciden sobre las controversias legales. *Peña v. Peña*, res. el 15 de junio de 2005, 164 D.P.R. ___ (2005), **2005 J.T.S. 89**, pág. 1353, que cita con aprobación a *Ortiz v. Meléndez,* res. el 3 de marzo de 2005, 163 D.P.R. ___ (2005), **2005 J.T.S. 25**, pág. 784. Por esta razón, un tribunal está facultado para, discrecionalmente, limitar el número de peritos que las partes pueden presentar a su favor. Regla 55 de Evidencia, 32 L.P.R.A. Ap. IV, R. 55; *Peña v. Peña, supra,* pág. 1354. ■

En el caso de autos, el Tribunal de Primera Instancia resolvió que la trabajadora social Ortiz Díaz fue interrogada y contrainterrogada sobre su educación, licencias profesionales, certificados, experiencias,

publicaciones, proyectos de investigación, conocimiento de la bibliografía sobre el tema de abuso sexual, adiestramientos y cursos en la materia, experiencias previas como perito en los tribunales en casos de esa naturaleza y los casos que había manejado.

De la prueba surgió que la Sra. Ortiz Díaz tiene un bachillerato y una maestría en Trabajo Social; que tiene más de diez años de experiencia en la profesión; que ha evaluado más de cien casos de abuso sexual; que ha participado en alrededor de quince casos en los tribunales y ha sido calificada como perito en el campo de abuso sexual de menores; que ha tomado adiestramientos y conoce la bibliografía relevante sobre la materia; y que pertenece a la *National Association of Social Workers* y al Colegio de Trabajadores Sociales de Puerto Rico. Basado en estas calificaciones, el Tribunal de Primera Instancia cualificó como perito a la Sra. Ortiz Díaz y permitió el testimonio de ésta para validar el abuso sexual de los hijos de la peticionaria. En este sentido, el efecto de su determinación fue constituir a la Sra. Ortiz Díaz en perito del tribunal sobre este particular.

En el caso que nos ocupa, la trabajadora social que hizo el informe no es funcionaria del Departamento de la Familia; forma parte de una universidad privada —la Universidad Carlos Albizu—, por lo que ésta es una perito imparcial. No surge del expediente que la parte peticionaria objetara fundamentadamente su capacidad y calificación como perito para validar el abuso sexual de los menores de edad en la vista señalada con ese propósito. Es decir, en el caso de autos, el Tribunal de Primera Instancia cualificó como perito imparcial o del foro a la trabajadora social Ortiz Díaz, por considerar que ésta poseía especial conocimiento, experiencia y adiestramiento en materia de abuso sexual y había realizado las entrevistas y ejercicios que su profesión acepta como adecuados para validar las alegaciones del Departamento en cuanto al comportamiento en que fundamentó la solicitud de privación de custodia de la peticionaria. No erró el foro *a quo* al así hacerlo.

**B**

Nos corresponde ahora evaluar si procedía que el Tribunal de Primera Instancia autorizara el nombramiento del perito de la parte peticionaria para que evaluara nuevamente a los menores, aun cuando aceptó el testimonio, la pericia y el informe de la Sra. Ortiz Díaz para validar el abuso sexual de las niñas R.C.G. y C.M.C.G.

Conforme a la facultad de *parens patriae* del tribunal, éste puede ordenar la comparecencia de todas las personas que le pueden servir de ayuda para llevar a cabo su delicada responsabilidad, que incluye ordenar las investigaciones de índole social que entienda procedentes. *Peña v. Peña*, **2005 J.T.S. 89**, pág. 1354. Ahora bien, la facultad de los tribunales para ordenar un examen físico o mental no puede ejercerse livianamente. *Otero v. Delbrey*, 144 D.P.R. 688, 701 (1998). Se trata de una facultad discrecional que debe descargarse después de sopesar los efectos adversos que pueda tener la intromisión personal que representa ese examen. *Id.*

La jurisprudencia ha establecido la norma aplicable cuando una parte solicita que se realicen exámenes o pruebas científicas que inciden sobre el derecho a la intimidad de la víctima de delito. Así, en *Pueblo v. Arocho Soto*, 137 D.P.R. 762, 769 (1994), en el contexto de un proceso criminal, el Tribunal Supremo expresó que el derecho de un acusado al descubrimiento de prueba está limitado cuando incide sobre el derecho a la intimidad de la víctima o de otro testigo. Asimismo, el Alto Foro indicó que el derecho a la intimidad y a la integridad personal impide el uso de exámenes o pruebas científicas por parte de un acusado, excepto cuando éste demuestre una *clara necesidad* para ello. Por tal razón, el Tribunal de Primera Instancia debe sopesar los intereses en conflicto y ordenar el examen en cuestión si la necesidad de éste es mayor que el perjuicio que se causaría a la intimidad e integridad de la persona que será evaluada.

En *Otero v. Delbrey*, ya citado, el Tribunal Supremo extendió la norma sentada en *Pueblo v. Arocho*, *ante*, a los procedimientos civiles para proteger a la alegada víctima de abuso sexual de sufrir daños emocionales adicionales al someterse a evaluaciones sicológicas que puedan ser innecesarias. A esos efectos, dictaminó que, si en el contexto de un procedimiento penal —en el cual un acusado se enfrenta a una condena criminal y en el que se proveen las más amplias garantías procesales—, se ha determinado que el acusado tiene que probar una

clara necesidad para solicitar que una víctima se someta a exámenes sicológicos o científicos, con más razón debía requerírsele a una parte que solicite someter a una alegada víctima de abuso sexual a una evaluación sicológica en un procedimiento civil. *Otero v. Delbrey*, 144 D.P.R., a las págs. 702-703.

El Tribunal Supremo destacó que la política judicial de sopesar el interés de una parte en utilizar los mecanismos de descubrimiento de prueba a su alcance *vis a vis* los efectos adversos de una intromisión con la vida privada y el bienestar de una alegada víctima de abuso sexual aplicaba a casos en que las víctimas eran menores de corta edad, cuyo bienestar emocional está revestido del más alto interés público. *Id.* Por tal razón, el foro de primera instancia debe hacer este balance de intereses al ejercer su discreción de si autoriza o no los exámenes en cuestión. *Id.*, pág. 703.

Más recientemente, en *Peña v. Peña*, ya citado, el Tribunal Supremo reiteró la norma que establece que cuando una parte interese que un perito privado someta a unos menores a evaluaciones sicológicas o siquiátricas adicionales a las ya efectuadas por el perito del tribunal, la parte solicitante tiene que demostrar, como cuestión de umbral, una necesidad clara que justifique las pruebas adicionales. *Id.*, a la pág. 1354.

Establecida la "*clara necesidad*" de las pruebas, entonces el tribunal debe confrontar los intereses de quien hace la petición frente a la intimidad, la necesidad de protección y el bienestar general de esos menores. Al así hacerlo, el tribunal debe sopesar, entre otros, los siguientes factores: (1) la naturaleza del examen solicitado y lo invasivo de éste; (2) la edad del menor involucrado; (3) el efecto o la carga emocional o física que el examen o evaluación adicional acarreará para el menor; (4) el valor probatorio que ese testimonio tendrá sobre la controversia legal planteada ante el tribunal y la evidencia disponible a las partes y al tribunal en ese momento. *Id.* De esa forma, se logra establecer un balance adecuado entre el interés de las partes de llevar a cabo un descubrimiento de prueba y el derecho a la intimidad de los menores. *Id.*

Nótese que estos criterios minimizan el efecto perjudicial que tiene en los menores las constantes evaluaciones en casos de esta naturaleza, tomando en consideración que estos casos están matizados por una fuerte carga emocional que afecta, no sólo a las partes, sino también y, sobre todo, a los menores involucrados. *Id.* Además, adviértase que, en última instancia, el derecho al descubrimiento de prueba de una parte no puede satisfacerse a costa de la salud emocional de un menor. *Id.*

Luego de examinadas las normas que anteceden, procede evaluar si la madre de los menores probó la clara necesidad de efectuar nuevamente pruebas sicológicas a los menores, por medio de un perito contratado por esa parte.

La madre de los menores arguye que debe permitírsele contratar a un perito privado por varias razones: la Sra. María Ortiz Díaz señaló en su informe que entrevistó a la menor R.C.G. en cinco ocasiones durante diez meses y a la menor C.M.C.G. en tres ocasiones durante igual período; no se realizó entrevistas colaterales a la trabajadora social que hizo el referido, a los vecinos, al personal escolar, ni a los familiares; las menores fueron removidas de su hogar biológico muchos meses antes de que se iniciaran las entrevistas y no volvieron a tener comunicación alguna con sus progenitores; los hijos han estado en varios hogares de crianza durante gran parte de sus cortas vidas, lo que aumenta la posibilidad de que los alegados actos lascivos hubiesen ocurrido en alguno de esos hogares de crianza; y permitir unas evaluaciones sicológicas por un profesional con las herramientas necesarias para minimizar la carga emocional para los menores no implicaría daño alguno para ellos, sin embargo, podría corroborar las inconsistencias entre las versiones de las niñas.

La peticionaria nunca ha indicado en qué consisten las inconsistencias del testimonio de las menores ni señaló condiciones mentales o emocionales de sus hijas que pudieran viciar sus expresiones espontáneas y reiteradas a varias personas, entre ellas, la trabajadora social escolar, los trabajadores sociales y funcionarios del Departamento de la Familia, el médico que las examinó y los agentes del orden público. La peticionaria

tampoco demostró que los beneficios de la nueva evaluación sicológica sobrepasarían las consecuencias perjudiciales que pudiera ocasionarles a los menores, quienes ya fueron sometidos a entrevistas y evaluaciones por personas competentes en este campo del abuso sexual.

De igual forma, si examinamos los factores enumerados en *Peña v. Peña*, a la pág. 1354, es inevitable concluir que, al sopesar los intereses de la peticionaria frente a la intimidad de los menores, la balanza tiene que inclinarse a favor de la intimidad y la estabilidad de éstos. Los menores ya tienen edades que oscilan entre 10 y 15 años y el Departamento de la Familia ha estado a cargo de su custodia desde que tenían entre 3 y 8 años, es decir, desde 1999, cuando el Departamento los sacó del hogar materno, primero a las niñas, luego a los varones, para colocarlos paulatinamente en distintos hogares certificados por la agencia. Con el agravante de que estos niños regresaron al ambiente abusivo por orden del tribunal, para luego ser rescatarlos nuevamente por hechos análogos, reiterados abiertamente por sus hijas a terceras personas y validados por una profesional de la conducta humana que el tribunal seleccionó para ello.

Consideramos que las razones en las que la peticionaria basa su solicitud no cumplen el criterio de umbral: la clara necesidad de someter a los niños a más pruebas, entrevistas o exámenes sicológicos para derrotar, *por su propio bienestar*, la veracidad de unos hechos que, aunque originaron la intervención del Departamento en el caso de remoción de custodia de los progenitores sobre sus hijos e hijas, no son el único criterio para el reclamo institucional de la remoción de la custodia y el relevo de hacer esfuerzos para la reunificación familiar. En el caso de autos lo que está en juego es si los hijos pudieron ser objeto de abuso sexual por su padre biológico, si la madre es o no una madre protectora y si pueden ambos progenitores biológicos servir de recursos para la tenencia física de sus propios hijos.

Por otra parte, debemos recordar que, en última instancia, la responsabilidad y la capacidad para adjudicar un pleito de custodia descansa, no en los peritos que testifican a petición del foro o a favor de una parte, sino en los tribunales. *Peña v. Peña*, pág. 1353, que cita a *Ortiz v. Meléndez*, pág. 784. Tampoco debemos olvidar que los pleitos de custodia no pierden, por su particular naturaleza, el carácter de procesos civiles en los que el *quántum* de la prueba, aunque rigurosa, por las implicaciones constitucionales de la privación, no alcanza el criterio de "*fuera de toda duda razonable*" en la mente del juzgador. La importancia de los intereses involucrados en este tipo de caso no impone sobre el juzgador una norma distinta sobre la suficiencia evidenciaria necesaria para sostener la determinación judicial recurrida. Aún más, en caso de duda, la determinación ha de inclinarse a favor del bienestar óptimo y la protección de los mejores intereses de los hijos afectados, no de los progenitores.

En virtud de lo anterior, resolvemos que en el caso de autos la peticionaria no cumplió con los requisitos establecidos en la jurisprudencia para autorizar el examen psicológico de unos menores que han sido víctimas de abuso sexual y determinamos que el examen psicológico solicitado es innecesario en el escenario procesal que tenemos ante nos y sería potencialmente perjudicial a la salud emocional de los niños. Por tal razón, dictaminamos que el Tribunal de Primera Instancia no abusó de su discreción al no autorizar a la peticionaria a contratar un perito para que hiciera pruebas psicológicas a sus hijos con el propósito de rebatir la validación del abuso sexual imputado al padre biológico y a la propia peticionaria. No erró el foro recurrido al denegar la petición ni violó el debido proceso de ley de la peticionaria al así hacerlo.

## IV

En su segundo señalamiento de error, la peticionaria cuestiona la decisión del Tribunal de Primera Instancia de validar el alegado abuso sexual de las menores y de eximir al Departamento de la Familia de hacer esfuerzos razonables para reunificar a los menores con sus padres y descartar como recurso a los padres de los menores.

## A

El Tribunal de Primera Instancia basó su determinación en el testimonio de la trabajadora social, Sra. Ortiz

Díaz, quien declaró que en su evaluación utilizó el modelo comprensivo, diagramas anatómicos y técnicas de dibujo y juegos. Ésta indicó que realizó cinco entrevistas a R.C.G. y tres a C.M.C.G., por separado e individualizadas; que ambas niñas coincidieron en los aspectos básicos del abuso sexual (actos lascivos), luego de aplicar los ocho criterios del método comprensivo, que describe extensamente en su informe.

El tribunal *a quo* también tomó en consideración el informe final rendido por la trabajadora social, que recoge detalladamente las manifestaciones hechas por las menores en las entrevistas que sostuvo con éstas. Del informe surge que la menor R.C.G. le manifestó originalmente a la trabajadora social de su escuela que su padre biológico estaba enamorado de ella; que le daba besos en la boca, *"en la tota y en el culo"*; que *"le sacaba la lengua en la tota"*; que su madre se copiaba y comenzaba a hacerle lo mismo a su hermana; que todos dormían juntos en una cama y se tocaban entre ellos; y que sus hermanos también la tocaban en *"la tota y en el culo"*.

Luego que fueron referidas a la Universidad Carlos Albizu, en las entrevistas sostenidas por la trabajadora social con la menor R.C.G., esta última indicó que su papá le había visto sus partes privadas en la cama de éste y que las había visto porque le había *"dado la gana"*; que eso fue lo que éste le dijo a su mamá cuando ésta le preguntó; y que la habían tocado en *"su toto"* y en sus tetas. La menor marcó con una crayola en el dibujo de la figura humana las áreas donde la tocaron y marcó en la figura humana de adulto las manos, como la parte con que la habían tocado. Esa menor reiteró que su papá era el que la tocaba y que su mamá se copiaba y tocaba a su hermana C.M.C.G.; que su papá le daba, a veces, besos en *"la tota"*; que su papá sólo la tocaba a ella, porque él sólo la quería a ella; y que él estaba *"enamorado de ella"* y no quería a su hermana y que, por eso, su papá sólo la tocaba a ella.

Asimismo, surge del informe que en la entrevista sostenida con la trabajadora social, la menor C.M.C.G. manifestó que su papá le untaba alcohol frío en sus partes privadas; que le quitó la ropa para untarle *"vicks"* frío en *"la totin"*; y que su papá le tocaba *"el totin y las tetas"*. La menor marcó en el dibujo de la figura humana las partes que le habían tocado e identificó su *"toto"*, los senos y su barriga. Cuando le mostraron a la menor el dibujo de la figura humana masculina de un adulto, ésta indicó que se parecía a su papá porque tenía *"el pipí grande, tenía pelos y era color negro"*. La menor identificó las manos y el área genital como las partes del cuerpo que su papá utilizó para tocarla. La menor también indicó que su papá le tocaba las nalgas y el pecho. Según la menor, estos actos pasaban en la cama y, a pesar de que su mamá los veía, ésta no hacía nada. La menor C.M.C.G. también manifestó que su papá tocaba a sus hermanos *"en los huevos"* y después se iba a dormir; y que, a veces, las acostaban a dormir sin ropa y ellas se quejaban de frío, pero no las cubrían.

Cabe destacar, además, lo señalado en el informe respecto a que la revelación del abuso por parte de la menor R.C.G. surge de forma espontánea, cuando ésta se lo manifiesta a la trabajadora social de su escuela, lo que es un indicio de confiabilidad. De igual forma, es importante señalar que en las entrevistas con las distintas trabajadoras sociales las menores reiteraron los hechos constitutivos del abuso sexual, ofrecieron detalles de los actos específicos de los que eran víctimas y fueron consistentes en sus versiones individuales.

A base de la prueba que tuvo ante sí el Tribunal de Primera Instancia, resolvemos que ese foro no abusó de su discreción al validar las imputaciones de abuso sexual hechas por las menores a base del informe rendido por la trabajadora social cualificada como perito.

**B**

La peticionaria también arguye en su segundo señalamiento de error que no procedía eximir al Departamento de la Familia de realizar esfuerzos razonables para preservar la integridad familiar ni descartar a ambos progenitores como recurso. No tiene razón. Veamos porqué.

La Ley para el Bienestar y la Protección Integral de la Niñez, Ley 177, *supra*, establece que el Departamento de la Familia hará esfuerzos razonables para el bienestar y la protección integral del menor y para

preservar la integridad familiar previo a la remoción de un menor de su hogar. Art. 50, 8 L.P.R.A. sec. 447s; *Pueblo en interés menores R.P.S. et al.*, 134 D.P.R. 123, 137 (1993). Por tal razón, luego de que se remueva a un menor de su hogar, se realizarán esfuerzos razonables para reunificar al menor con su familia por un período que no excederá de los doce meses, para lo cual se le brindarán servicios de apoyo. Este artículo, no obstante, exime de esta obligación al Departamento de la Familia en ciertos casos. Específicamente, el inciso (3) del Art. 50, dispone, entre las circunstancias bajo las cuales no se harán los esfuerzos razonables, las siguientes:

*"(3) No se harán esfuerzos razonables para reunir a un menor con su padre, madre o persona responsable de éste en las siguientes circunstancias:*

*(a)...*

*(b)...*

*(c)...*

*(d) El menor ha sido removido del hogar con anterioridad y, luego de haberse adjudicado la custodia del menor al padre, a la madre o persona responsable de éste, el menor, un hermano/a o cualquier otro miembro del núcleo familiar es nuevamente removido por haber sido víctima de maltrato y/o negligencia.*

*(e)...*

*(f) El padre, la madre o persona responsable del menor incurre en la conducta o las conductas que se especifican en las cláusulas (e) y (f) del inciso (2) del presente artículo.*

*(g) El padre, la madre o persona responsable del menor incurre en conducta que de procesarse por la vía criminal constituiría delito al ayudar, intentar, conspirar, solicitar o aconsejar a la comisión de delitos que atentan contra la salud e integridad física, mental, emocional del menores, según se dispone en las secs. 3001 et seq. del Título 33. Ley Núm. 115.*

*(h) El padre, la madre o persona responsable del menor incurre en conducta obscena según definida en las secs. 3001 et seq. del Título 33."*

De igual forma, el inciso 2 del Art. 50, *supra*, establece que no se harán esfuerzos razonables previos a la remoción de un menor de su hogar cuando:

*"(a) ...*

*(b) ...*

*(c) ...*

*(d)...*

*(e) el padre, la madre o persona responsable del menor incurre en conducta o conductas que, de procesarse por la vía criminal, constituirían los delitos de: asesinato en primer grado o segundo grado, agresión en su modalidad agravada menos grave o agravada grave, mutilación, violación, actos lascivos o impúdicos, comercio de personas para actos sexuales, envío, transportación, venta, distribución, publicación, exhibición o posesión de material obsceno, espectáculos obscenos y exposición a menores de estos delitos, incesto, secuestro y secuestro agravado, abandono de menores, robo de menores, perversión de menores,*

*incitación a un menor para cometer delito.*

*(f) el padre, la madre o persona responsable del menor que fuera coautor, encubriere o conspirare para cometer uno o varios de los delitos enumerados en la cláusula (e) de este inciso, según definidos por el Código Penal."* (Énfasis suplido.)

En el caso de autos, se dan dos de los criterios que eximen al Departamento de realizar esfuerzos razonables para reunificar el núcleo familiar. En primer lugar, las hijas menores fueron removidas del hogar con anterioridad y, luego de que los padres recuperaron su custodia, fueron removidas *nuevamente* por alegaciones de haber sido víctimas de abuso sexual. En segundo lugar, el padre y la madre de las menores incurrieron en conducta que, de procesarse por la vía criminal, configuraría el delito de actos lascivos o impúdicos.

Cabe destacar, además, que el Tribunal Supremo ha resuelto que la reintegración de un menor a su hogar biológico se debe llevar a cabo *siempre y cuando no exista ningún tipo de riesgos para su salud y bienestar. Pérez, Ex parte v. Depto, de la Familia*, 147 D.P.R. 556, 565 (1999), que sigue la norma sentada en *Hidalgo v. Depto. de Servicios Sociales*, 129 D.P.R. 605 (1991). En este caso, como hemos señalado, no se dan esas circunstancias. En virtud de lo anterior, resolvemos que el Tribunal de Primera Instancia actuó correctamente al eximir al Departamento de la Familia de realizar esfuerzos razonables para reunificar a los menores con sus padres biológicos.

El derecho de un progenitor a tener a sus hijos e hijas en su compañía es de superior jerarquía, pero ese derecho tiene que ceder ante la facultad de *parens patriae* del Estado de salvaguardar y proteger el bienestar de los menores. *Rivera v. Morales*, res. el 3 de marzo de 2006, 166 D.P.R. ___ (2006), **2006 J.T.S. 41**, pág. 1013. De ahí que la Ley para el Bienestar y Protección Integral de la Niñez, *supra*, reconoce la facultad del Estado de privar, restringir o suspender la patria potestad o la custodia de los padres sobre sus hijos e hijas. *Id.* Por tal razón, un tribunal debe privar a un padre de la custodia de un menor luego de realizar un análisis objetivo, sereno y cuidadoso de todas las circunstancias presentes en el caso ante su consideración, teniendo como único y principal objetivo su bienestar óptimo. *Ortiz v. Meléndez, supra*, pág. 779.

La cronología procesal del caso de autos demuestra que desde diciembre de 1999, el Departamento de la Familia intervino con los padres de estos menores ante una petición de emergencia por negligencia y maltrato físico contra los menores. Luego en 2002, la menor R.C.G. manifestó que era molestada sexualmente por su padre, lo que requirió nuevamente la intervención del Departamento de la Familia. Tres años más tarde, en 2005, hubo otra petición de emergencia al Departamento de la Familia por alegado abuso sexual del padre para con sus hijas menores, razón por la cual el Departamento de la Familia solicitó la custodia provisional de las niñas y las retiró definitivamente del hogar. En el relato de las menores, la peticionaria aparece como madre no protectora; que llamó a su hija R.C.G. mentirosa, ante las declaraciones de la menor de haber sido abusada sexualmente por su padre; que la castigaba por haber hecho las aludidas expresiones en la escuela, porque *"lo que ocurría en la casa no debía decirse en la escuela"*.

Es decir, que el Tribunal de Primera Instancia tuvo ante sí un cuadro repetido de negligencia, maltrato físico y posible abuso sexual del padre, con el agravante de que la peticionaria no fue una madre protectora y mostró reiteradamente una actitud de negación de los hechos constitutivos de abuso sexual en contra de sus hijas. Más aún, una de las niñas le imputó también ser agresora sexual al hacerle a su hermana lo mismo que su que su papá le hacía a ella.

Los hechos probados ante el tribunal *a quo* demuestran que la peticionaria y el padre biológico de sus hijos e hijas no están capacitados para cumplir con la responsabilidad que le impone la Ley de Bienestar y Protección Integral de la Niñez, *supra*, de brindarle a su prole un ambiente saludable que promueva su desarrollo social, emocional, físico e intelectual. Por tal razón, el Tribunal de Primera Instancia los descartó como recurso, luego

de evaluar el historial del caso y dar credibilidad a la información que surgía de los informes sociales y las evaluaciones de la trabajadora social, Sra. María D. Ortiz Díaz, sobre distintos aspectos de la crianza de los menores junto a sus progenitores y de su entorno familiar y social. Resolvemos, por lo dicho, que el foro recurrido no cometió el segundo señalamiento de error.

## V

Por lo fundamentos expuestos, se expide el auto solicitado y se confirma la resolución recurrida. Se deja sin efecto nuestra orden de paralización de los procedimientos del Tribunal de Primera Instancia.

Así lo acordó y manda el Tribunal y lo certifica la Secretaria Interina del Tribunal.

Mildred Ivonne Rodríguez Rivera
Secretaria Interina del Tribunal de Apelaciones

### ESCOLIOS 2006 DTA 106

**1.** Aparentemente, el trabajador social a cargo del caso se enfermó y la agencia no dio seguimiento a sus recomendaciones. (Apéndice de la peticionaria, pág. 23.)

**2.** La Regla 59 de Evidencia, *supra*, establece como sigue:

*"(A) Nombramiento — Antes del comienzo del juicio o durante el transcurso de éste, cuando el tribunal determine que es necesaria prueba pericial, podrá de su propia iniciativa, o a solicitud de parte, nombrar uno o más peritos para que investiguen y sometan un informe según lo ordene el tribunal, o para que declaren en calidad pericial en el juicio. El tribunal determinará la compensación por los servicios del perito.*

*(B) Compensación — En toda acción criminal o procedimiento de menores, la compensación será pagada con fondos del Estado. En todas las demás acciones civiles, la compensación será pagada por las partes envueltas en el litigio en la proporción que el tribunal determine, sujeto a que luego sea impuesta como otras costas o desembolsos conforme a derecho.*

*(C) Presentación e interrogatorio — Cualquier perito nombrado por el tribunal conforme a esta regla podrá ser llamado a declarar y ser interrogado por el tribunal o por cualquier parte. Cuando sea llamado e interrogado por el tribunal, las partes tendrán el mismo derecho a contrainterrogar como si se tratare de cualquier otro testigo.*

*(D) Derecho a presentar otra evidencia pericial — Esta regla no impedirá que cualquier parte presente evidencia pericial adicional sobre el mismo hecho o asunto sobre el que declara o informa el perito nombrado por el tribunal. Si la parte presenta su propio perito, pagará sus honorarios sin que dicho pago sea recobrable como costas, a menos que el tribunal discrecionalmente disponga lo contrario."*

**3.** La Regla 52 de Evidencia, *supra*, dispone lo siguiente:

*"Cuando conocimiento científico, técnico o especializado sea de ayuda para el juzgador entender la evidencia o determinar un hecho en controversia, un testigo capacitado como perito en relación con la materia sobre la cual va a declarar podrá testificar en forma de opiniones o de otra manera."*

**4.** La Regla 55 de Evidencia, *supra*, establece como sigue:

*"El tribunal podrá, en cualquier momento anterior al comienzo del juicio o durante el mismo, limitar el número de peritos que podrán ser presentados por cualquiera de las partes."*